Filed 10/25/24

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079255 |
| v. | (Super.Ct.No. CR45819) |
| JAMES ALVIN THOMPSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge. Reversed and remanded with directions.

Law Offices of Michael Clough, and Michael Clough for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel, Holly D. Wilkens, Tami Falkenstein Hennick, and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

In April 1996, defendant James Alvin Thompson was convicted of first degree murder by a jury which also found true the special circumstance allegation that the murder was committed while Thompson was engaged in the commission or attempted commission of robbery and that he had previously been convicted of murder. (Pen. Code, §§ 187, 189, 190.2, subd. (a)(2) & (a)(17)(A).)[1] Following the penalty phase, the jury returned a verdict of death. After denying Thompson's motions for a new trial (§ 1181) and for modification of the penalty (§ 190.4, subd. (e)), the trial court sentenced him to death. On direct appeal, the conviction and sentence were affirmed.[2]

Following the enactment of Senate Bill No. 1437 (§ 1170.95, renumbered as §1172.6),[3] Thompson filed a petition for resentencing. The trial court summarily denied the petition, ruling that the findings on the special circumstances allegations rendered him statutorily ineligible. On appeal, Thompson argues the trial court erred in concluding the special circumstances findings rendered him ineligible. We remand with directions to

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     Thompson also filed a petition for writ of habeas corpus in the Supreme Court prior to the enactment of Proposition 66. That petition was transferred to the superior court where it was denied, and, pursuant to the revised habeas corpus procedures, Thompson appealed the denial to this court. (*In re Thompson on Habeas Corpus*, E072699.) That appeal has been stayed pending resolution of questions regarding the appointment and compensation of counsel in death penalty habeas appeals.

[3]     Effective June 30, 2022, former section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We shall refer to the statue by its current designation.

vacate the trial court's order denying the resentencing petition with directions to allow Defendant to file a limited petition for writ of habeas corpus challenging the murder conviction as provided in section 1172.6, and reserving action on all other issues that are presently pending and stayed in *In re Thompson on Habeas Corpus*, *supra*, E072699.

## BACKGROUND

The facts of the offense are taken from the direct appeal, *People v. Thompson* (2010) 49 Cal.4th 79 (*Thompson I.*):

"On the evening of either August 26 or August 27, 1991, defendant, a 39-year-old White male, met the victim, Ronald Gitmed, a 25-year-old White male with mental developmental disabilities. Defendant convinced Gitmed to drive him to a trailer compound in rural Riverside County to visit Tony Mercurio, whom defendant had met when they were both serving time in prison. Later that same night, defendant, Gitmed, and Mercurio left the trailer compound in Mercurio's truck to go four-wheel driving in the hills around Canyon Lake. On the morning of August 28, Gitmed's body was found floating in a remote section of the lake; he had been killed by three gunshot wounds. The prosecution's main witness was Mercurio, who testified defendant robbed and shot Gitmed at Canyon Lake. Other individuals living at the trailer compound testified that, after the murder, defendant took Gitmed's car and, together with Mercurio, removed Gitmed's property from Gitmed's storage locker in Riverside. The defense challenged Mercurio's credibility and presented an alibi defense that defendant had been with his uncle the entire evening of August 27.

3

**"I. GUILT PHASE**

"A. *Facts*

"1. *The Prosecution's Case*

"a. *Discovery of the body and autopsy*

"In the late morning of August 28, 1991, a group of people who had gone to Canyon Lake in Riverside County to jet ski discovered the body of Ronald Gitmed floating in the water. The body was clad in a pair of Levis and white socks, but no shirt. An autopsy the next morning found three gunshot wounds to the body, one on the right upper chest, one on the left side of the lower back, and one on the left forearm. Two expended .22-caliber bullets were removed from the body, but whether they had been fired from the same gun could not be determined. The coroner found the remains of hamburger, potato, and pickle in Gitmed's stomach. A blood analysis detected methamphetamine but no alcohol. In the coroner's opinion, Gitmed had died immediately from the gunshot wounds, and the absence of water in his airway passages indicated he had not drowned. The coroner could not pinpoint a time of death beyond saying that Gitmed had not been dead for very many days.

"b. *Timeframe for the murder*

"The prosecution presented evidence that Gitmed was alive at least up to the early evening of Monday, August 26, 1991, but was dead by the morning of Wednesday, August 28, when his body was discovered floating in Canyon Lake. Don Fortney, Gitmed's friend, testified that on August 26, Gitmed was vacating his apartment, and Fortney helped him move his possessions to a storage locker, finishing about 3:00 p.m.

4

Gitmed also stored stacks of his clothing in his car, a small blue Toyota Tercel hatchback. Gitmed's mother, Naomi Dekens, testified Gitmed visited her at her home that evening about 7:00 p.m. Bank records indicated Gitmed's last automatic teller transaction and last credit card transaction occurred on August 26.

"c. *Defendant's interactions with the victim's cousin*

"Defendant met Gitmed through Gitmed's cousin, Michelle Keathley. Keathley had first met defendant at a pool hall in Riverside in August 1991. Defendant would occasionally drop by Keathley's house over the next few weeks. During one of these visits, he used methamphetamine with Keathley, Keathley's sister Alicia Levenson, and Alicia's boyfriend Eric Arias. During that visit, defendant offered Arias up to $2,000 to give him a ride to the Lake Elsinore area in order to collect a $6,000 debt owed him. Defendant mentioned he would be bringing a gun. Arias initially accepted defendant's offer, but later backed out.

"At a subsequent visit to Keathley's house, sometime after 5:00 p.m. on either August 26 or 27, defendant met Gitmed. Keathley's friend Ronada Briggs was at the house at the time and remembered meeting defendant and seeing him with Gitmed. For defendant's promise of $1,000, Gitmed agreed to drive him to collect the $6,000 debt. Before they left, defendant said they would first be stopping at 'Tony's house.' Gitmed drove off with defendant, and Keathley never saw Gitmed again.

"d. *Visit to the Triplett family trailer compound*

"After leaving Keathley's house, defendant and Gitmed drove in Gitmed's car to the Triplett family trailer compound. The compound was located on Santa Rosa Mine

5

Road in a rural area outside the town of Perris and consisted of mobilehomes, campers, and storage sheds spread over five acres. There was a 'chop shop' on the property, where stolen vehicles were stripped, repainted, or otherwise altered for sale. Barbara Triplett lived there with her daughter Charlene and her brother Danny Dalton, who ran the 'chop shop.' Also living on the property was Charlene's boyfriend, Anthony Thomas Mercurio, a parolee who had recently been released from prison. Defendant first met Mercurio in July 1991, when both of them were incarcerated in state prison, and he had visited Mercurio at the Triplett compound once before.

"Mercurio had not been expecting defendant to come that night, and he did not know Gitmed, whom defendant introduced as his friend 'Ron.' After a dinner of hamburgers and french fries, defendant, Gitmed, and Mercurio used some methamphetamine that Gitmed had brought. While the three of them were walking around the property, Gitmed noticed a red four-wheel-drive pickup truck, and they decided to go 'four-bying' in the countryside. The truck, which had been on the property for at least a couple of weeks, was stolen and had to be started with a screwdriver.

"e. *The shooting at Canyon Lake*

"With Mercurio at the wheel, the three drove across the hills to Canyon Lake. It was after dark when they started. When they arrived at the lake, they parked on a peninsula about 30 to 40 feet from the water's edge. Mercurio stayed near the truck while defendant and Gitmed walked out onto the peninsula. Mercurio heard defendant and Gitmed start to argue, but could not make out what the argument was about. Defendant's voice got louder and angrier, and Mercurio heard defendant tell Gitmed to

6

take off his clothes. Gitmed started to get undressed, and Mercurio heard two to three shots. Mercurio got back inside the truck. Defendant returned and threw some things into the back of the truck, including Gitmed's clothing and some small items that might have been Gitmed's wallet or some change. As they drove off, Mercurio saw Gitmed's body on the ground near, but not in, the water. They rode in silence back to the Triplett compound. At the compound, defendant started going through the items in Gitmed's car, which had been left parked there. The car was filled with several trash bags full of clothing and some stereo equipment.

"f. *Defendant's activities in the days following the murder*

"Defendant left the compound in Gitmed's car. Michelle Keathley testified that around 3:30 on the morning following the night defendant and Gitmed had left her house, defendant came to her house to retrieve his bicycle, which he had tied to a tree near the front door. Keathley asked defendant where Gitmed was, and defendant initially said he was down the street and would arrive in a couple of minutes. When Gitmed failed to appear, Keathley again asked: 'What happened to Ron?' Defendant then stated there 'was a little bit of a scuffle,' and Gitmed had gotten 'a little scared' and might have gone home.

"At the compound a day or two after Gitmed's murder, Mercurio again saw defendant going through the items in Gitmed's car. He saw a small handgun on the car's hood. Several days later, Mercurio, at defendant's request, accompanied defendant to Gitmed's storage locker in Riverside to pick up some furniture defendant said he owned and wanted to give to Mercurio. Defendant drove Gitmed's car, and Mercurio followed

7

in the red pickup truck.  Defendant entered the correct code in the box at the storage facility's security gate, and it opened.  The two went to the storage locker and loaded several small furniture items into the truck, including a television, a videocassette recorder, and a television stand.  They took the items to Charlene Triplett's dwelling at the compound.

"After defendant and Mercurio returned with the furniture, Charlene saw them at the dumpster burning papers.  Defendant was cleaning a gun, and Mercurio asked Charlene for some lighter fluid, which he gave to defendant to clean the gun.  Later, outside defendant's presence, Charlene confronted Mercurio about why they were burning papers, and he told her defendant had shot Gitmed at Canyon Lake.  Later, when Charlene was in the bedroom of her mobilehome, she overheard defendant and Mercurio talking outside.  Defendant told Mercurio:  'Whatever you do, you've got to get your girlfriend and her family to go along with our story.'

"Defendant asked Charlene whether she wanted to buy the car stereo from Gitmed's car or knew anyone who did.  Eventually, Dalton sold the stereo and split the money with defendant and Mercurio.  Charlene deduced that the furniture was Gitmed's and asked Dalton to get rid of it.  Dalton did not do so and instead stored it in his camper.  On learning that, Charlene asked for the television back.

"A few days after taking the furniture from the storage locker, defendant was back at the compound trying to figure out how to dispose of Gitmed's car.  Defendant tried to give the car to Dalton to strip at his 'chop shop,' but Mercurio advised Dalton not to have anything to do with defendant or the car.  Finally, defendant, along with Mercurio and

8

Dalton driving in a separate vehicle, drove Gitmed's car to some hills near the compound, where defendant set fire to it.

"Sometime during this period defendant said something to Barbara Triplett about a person floating in Canyon Lake who was not able to make decisions for himself, which made her 'feel very uncomfortable and uneasy.' Defendant also started boasting to Dalton about leaving someone floating in the lake, but Dalton told him to shut up because he did not want to know anything about it. When Dalton learned that defendant had told Barbara and Charlene about the floating man, Dalton became angry and told defendant to leave the compound. Barbara gave defendant a ride to the Corona Motel in Riverside, which was the last anyone at the compound saw of him.

"g. *Police investigation following discovery of the body*

"After Gitmed's body was discovered on August 28, 1991, Michelle Keathley's ex-husband told her of newspaper articles about an unidentified body found in Canyon Lake. Because two weeks had passed since she had last seen Gitmed, she became concerned and contacted the police on September 11. The police showed her pictures of the victim, whom she identified as Gitmed. She told police Gitmed had left her house with defendant. On September 13, two police officers located defendant at the home of his mother, Jean Thompson Churder, and conducted a tape-recorded interview of him. Thereafter, defendant was taken into custody on a parole violation. The recorded interview was played to the jury. In it, defendant acknowledged he knew Michelle Keathley and had briefly met Gitmed at her house, but denied ever leaving Michelle's house with Gitmed. He also denied having been at Canyon Lake any time recently.

9

"On September 17, the police searched the Triplett compound pursuant to a narcotics warrant unrelated to the Gitmed murder. In the course of the search, the police came across an address book belonging to Barbara Triplett, which had the name 'Tex' (defendant's nickname) with a telephone number. The police asked Mercurio whether he knew anyone named Tex, and Mercurio eventually acknowledged that he did, stating, 'I knew you'd want to talk about Tex before you left here today.' Mercurio decided to cooperate with the police and, later that day, gave a tape-recorded statement that defendant had shot Gitmed at Canyon Lake. He told them the location of Gitmed's burned car and eventually took the police to the place where Gitmed had been shot. The police asked about the stolen furniture, and Mercurio directed them to a television, a videocassette recorder, three end tables, a vacuum cleaner, a lamp, and a fan. Mercurio stated defendant had given him the furniture, and he thought it belonged to Gitmed.

"Eva Lynn Thompson, defendant's sister, testified that sometime before defendant's arrest he brought to her apartment a suitcase and some boxes of clothes and asked her to store them because he was not sure he had a place to stay. After she learned of defendant's arrest, she panicked and had her son, Marc Brendlin, take the items to Churder's house. Brendlin testified that the items included boxes, a bag, some clothing, and a wallet containing business cards, but no identification.

"On September 25, the police returned to Churder's home with a search warrant to look for evidence related to the murder. While they were searching the residence, Churder arrived home in her car. Police opened the trunk of her car and recovered a green London Fog jacket and a black, blue, and white nylon duffel bag, both of which

10

Gitmed's mother identified at trial as belonging to her son. Gitmed had been wearing the jacket on Monday, August 26, when he visited his mother. The friend who had helped Gitmed move out of his apartment on August 26 also identified the nylon duffel bag as Gitmed's. A tattered wallet with business cards but no identification was found in Churder's house in a nightstand drawer in the bedroom defendant occupied before his arrest.

"h. *Mercurio's plea agreement*

"In January 1992, Mercurio engaged the police in an hour-long high-speed auto chase after he ran a red light. He was arrested for felony assault on a police officer and possession of a rifle. Mercurio signed an agreement with the Riverside County District Attorney providing that in exchange for his cooperation in defendant's case the district attorney would drop some of the charges arising from the chase. As part of the agreement, Mercurio pleaded guilty to evading arrest and being a felon in possession of a firearm. He also pleaded guilty to being an accessory after the fact to Gitmed's murder, based on his having helped defendant dispose of Gitmed's car. Mercurio spent one year in custody. Under the agreement, Mercurio was obligated to testify truthfully at defendant's trial. At the time Mercurio testified, he was scheduled to be sentenced in Las Vegas later that month on a separate charge, unrelated to the California cases, of being a felon in possession of a firearm.

"2. *The Defense Case*

"The defense presented an alibi for the evening of August 27, 1991, through the testimony of defendant's uncle, who stated he had been with defendant that entire

11

evening. In addition, to dispute Mercurio's account of the events at Canyon Lake the defense put on Marvin Avery, who testified he was at the lake around the time of the murder and saw someone who looked like Gitmed swimming and having a good time. The defense also sought to impeach Mercurio through his grand jury testimony about the murder and his high-speed chase with police officers.

"a. *Defendant's dinner with his uncle*

"Defendant's uncle, Richard Brent Hartenbach, testified he took defendant out to dinner on the evening of August 27. They went to a restaurant and a bar, and he brought defendant home about 10:30 or 11:00 p.m. After defendant's arrest, Churder called Hartenbach to tell him defendant had been arrested on suspicion of a murder she said occurred on Tuesday, August 27. Hartenbach told her that was impossible because he recalled being with defendant that night, and he knew it was Tuesday because defendant had a Wednesday morning meeting scheduled with his parole officer.

"b. *The swimming man at Canyon Lake*

"At the time of the murder, Marvin Avery, who did not know anyone involved in the case, lived in Perris and was a frequent visitor to nearby Canyon Lake. After seeing a newspaper article about the discovery of Gitmed's body, Avery contacted the police. In late August 1991, about four days before he saw the newspaper article, he had been fishing at Canyon Lake. Around 10:00 p.m., he saw four men and a woman in the area. They arrived in an early 1990's model three-quarter-ton pickup truck with a black toolbox and rack utility boxes. One man from the group, wearing 'whitish' jeans and no shirt, was singing and having fun. He walked through Avery's campsite, within five feet of

12

Avery, and then dived into the water. The man was a good swimmer and swam quite a distance out into the lake. Avery testified he had identified the swimming man as Gitmed from photographs shown to him by the police.

"Officer Betty Fitzpatrick testified that Avery had contacted the police on August 30, 1991, after police had released a composite drawing of Gitmed, who at that point was still unidentified. The police showed Avery two autopsy photos of Gitmed, and Avery identified them as the person he had seen at Canyon Lake on August 27. On cross-examination, Fitzpatrick testified that Avery took officers to the spot where he had seen the man swimming, a location west and slightly south of the channel across from where Gitmed's body was found. Mercurio later directed police to the exact location where Gitmed's body was found.

"c. *Gitmed's storage locker*

"The defense presented testimony of the manager of the ministorage facility where Gitmed used a locker. Entry to and exit from the facility required punching in an individual code at the gate, which was recorded on tape. Records from the facility showed that on August 26, there were three entries/exits, at 2:12/2:24 p.m., 3:46/4:01 p.m., and 5:45/6:01 p.m., respectively. There were no entries on August 27. On August 28, there were two entries/exits, at 12:45 p.m./1:02 p.m. and 4:24/4:41 p.m., respectively.

"d. *Mercurio's grand jury testimony*

"The defense read Mercurio's grand jury testimony about the shooting, which differed in some details from his testimony at trial. Unlike in his testimony at trial, in his

13

grand jury testimony Mercurio recalled seeing defendant hold a gun on Gitmed, saw the wallet and personal items being placed on the hood of the truck, and saw Gitmed fall down at the edge of the water.

"e. *Mercurio's high-speed chase*

"At trial Mercurio testified that in the high-speed chase culminating in his arrest he had never tried to ram the pursuing officers with his car. To impeach this testimony, the defense called two of the police officers involved in the chase. About 3:00 a.m., after running a stop sign, Mercurio led the officers in a vehicle pursuit that lasted nearly an hour, spanned about 20 miles, and eventually involved three or four police cars. He drove his car head on at police cars, and the police had to take evasive action to avoid being hit. Eventually, he fled on foot, and a scuffle ensued before he was apprehended.

"3. *Prosecution Rebuttal*

"Gitmed's mother, Naomi Dekens, and his younger brother, Bruce, testified that Gitmed was generally anxious and appeared slow and almost mentally retarded to people who did not know him. He had been under the care of a doctor from grade school through adulthood. He was very fearful of the water and would not go into it when they went to the beach. His mother forced him to take swimming lessons as a child, but he did not continue swimming after the lessons ended. He was self-conscious about his body and always wore big, bulky clothing. She had never seen him take off his shirt.

"Thomas Crompton, the defense investigator who interviewed defendant's uncle, Richard Hartenbach, testified that Hartenbach told him that August 27, 1991, was the night he was with defendant. However, Crompton did not put that date in his report, but

14

rather referred to the night as the date of the murder, which he believed was August 27. Nor did he include in his report that the reason Hartenbach had to have defendant home by 11:00 p.m. was that defendant had a meeting with his parole officer the next morning.

"The parties stipulated that Mercurio had not received immunity from prosecution for any events concerning Gitmed's death." (*Thompson I.*, *supra*, 49 Cal. 4th at pp. 86-95, fns. omitted.)

In April 1996, a Riverside County jury convicted Thompson of first degree murder and found true the special circumstance allegation that the murder was committed while Thompson was engaged in the commission or attempted commission of robbery. (§§ 187, 189, 190.2, subd. (a)(17)(A).) Following the penalty phase, the jury returned a verdict of death. After denying Thompson's motions for a new trial (§ 1181) and for modification of the penalty (§ 190.4, subd. (e)), the trial court sentenced him to death. (*Thompson I.*, *supra*, 49 Cal. 4th at p. 86.) The California Supreme Court affirmed the judgment on direct appeal in 2010 (*id.*, at p. 144) and the judgment became final in 2011 when the United States Supreme Court denied Thompson's petition for writ of certiorari. (*Thompson v. California* (2011) 562 U.S. 1146.) Habeas counsel was appointed several weeks later, and Thompson filed his initial habeas petition in the California Supreme Court in 2014.

In November 2016, while his initial petition for writ of habeas corpus was still pending, California voters approved Proposition 66, the "Death Penalty Reform and Savings Act of 2016." (*Briggs v. Brown* (2017) 3 Cal.5th 808, 822 (*Briggs*).) After the high court resolved several challenges to Proposition 66's provisions in its *Briggs*

15

opinion, it transferred Thompson's habeas petition to the Riverside County Superior Court. (§ 1509, subd. (g) ["If a habeas corpus petition is pending on the effective date of this section, the court may transfer the petition to the court which imposed the sentence"].)

In 2019, Thompson's habeas petition was denied.[4] Thompson filed a notice of appeal, but this Court stayed the appeal due to a lack of funding for appellate habeas counsel and that case remains stayed.

On January 31, 2022, Thompson filed a petition for resentencing pursuant to Senate Bills Nos. 1437 and 775. The court summarily denied Thompson's petition at the prima facie stage.

Thompson filed a timely notice of appeal.

## DISCUSSION

### 1. *Is a Capital Case Defendant Eligible for Resentencing Under Section 1172.6?*

Thompson argues that the trial court committed prejudicial error in ruling he was ineligible for resentencing relief due to the jury's finding on the felony-murder special-circumstances allegation, based on the then recent holding by the California Supreme Court in *People v. Strong* (2022) 13 Cal.5th 698, 721 (*Strong*). In the respondent's brief, the People argued Thompson is required to file a petition for writ of habeas relief in order to seek resentencing from a death sentence. (§ 1509, subd. (a).) The People

---

[4] The minute order denying the petition for writ of habeas corpus in its entirety is attached to the notice of appeal that was transmitted to this court on June 24, 2022.

16

acknowledged this issue had not been raised in the superior court, so they requested remand without prejudice to raise procedural arguments not inconsistent with *Strong*.

We requested and received supplemental briefing from the parties to address the question of whether a defendant under a death sentence is eligible to seek resentencing relief pursuant to section 1172.6, or if death sentences may only be challenged by a collateral attack by way of a habeas corpus petition, which the People elaborated at oral argument. We conclude a capital defendant is entitled to seek resentencing relief under section 1172.6, absent an expression of legislative intent to limit resentencing relief to noncapital defendants, but that the requested relief must be presented in a petition for writ of habeas corpus pursuant to section 1509, to comply with the mandate of Proposition 66.

a. *Statutory Framework and Standard of Review*

Proposition 66, pursuant to which section 1509 was enacted, was an initiative measure. Because "'"the Constitution's initiative and referendum provisions should be liberally construed to maintain maximum power in the people"'"' it is '"our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise.'" (*Briggs*, *supra*, 3 Cal.5th at p. 827, citing *Legislature v. Eu* (1991) 54 Cal.3d 492, 501.)

Article II, section 10 of the California Constitution provides that a statute enacted by voter initiative may be amended or repealed by the Legislature only with the approval of the electorate, unless the initiative statute provides otherwise. (Cal. Const., art. II, § 10, subd. (c).) Proposition 66 prohibits legislative amendment to any of its provisions unless the amendment is passed in both legislative houses by a three-fourths majority.

17

(Voter Information Guide, Primary Elec. (Nov. 8, 2016) text of Prop. 66, § 20, p. 218.) Senate Bill No. 1437, by which section 1172.6 was enacted, was passed by two-thirds vote in the Senate and a less-than-two-thirds majority in the Assembly, so it cannot modify or amend section 1509. (See *People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270, 277.)

"It is a well-settled principle of statutory interpretation that, where both text and purpose are clear, courts shall not endeavor to rewrite language of a ballot measure." (*People v. Valencia* (2017) 3 Cal.5th 347, 422.) The California Constitution prohibits the Legislature from amending or repealing a voter initiative, unless the initiative so provides. (Cal. Const., art. II, § 10, subd. (c).) """[T]he purpose of California's constitutional limitation on the Legislature's power to amend initiative statutes is to 'protect the people's initiative powers by precluding the Legislature from undoing what the people have done, without the electorate's consent.'""" (*People v. Alaybue* (2020) 51 Cal.App.5th 207, 214, quoting *People v. Kelly* (2010) 47 Cal.4th 1008, 1025.)

Therefore, the provisions of Proposition 66 limiting a capital defendant's postjudgment collateral attacks on a judgment of death by a petition for writ of habeas corpus are controlling. But that does not end our review.

b. *Harmoninizing the Right to Seek Review of the Current Validity of a Murder Conviction With the Proposition 66's Mandate*

We read section 1172.6 to apply to *all* murder convictions, irrespective of the penalty imposed. Therefore, it is important to ensure that defendant obtain review of his or her murder conviction in light of the amended provisions of sections 188 and 189, as

18

well as in light of the decisions of *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), irrespective of the procedural vehicle employed.

In determining that a capital defendant is entitled to the benefits conferred by Senate Bill No. 1437, we must construe the legislation. Because the resolution of this issue depends upon our interpretation of two statutes, we adhere to basic principles of statutory construction. As the California Supreme Court has explained in the context of reviewing resentencing petitions brought pursuant to Senate Bill No. 1437, "The proper interpretation of a statute is a question of law we review de novo. [Citations.] "“"As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning.'"" [Citation.] "'[W]e look to 'the entire substance of the statute … in order to determine the scope and purpose of the provision … . [Citation.]' [Citation.] That is, we construe the words in question "'in context, keeping in mind the nature and obvious purpose of the statute … ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment … by considering the particular clause or section in the context of the statutory framework as a whole.'"" (*People v. Lewis* (2021) 11 Cal.5th 952, 961.)

If the language is clear and unambiguous there is no need for construction, and we do not need to resort to indicia of the intent of the Legislature. (*People v. Morris* (2024) 100 Cal.App.5th 1016, 1031, citing *Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 850.) In such situations, "we may not add to or alter them to accomplish a purpose

19

that does not appear on the face of the statute or from its legislative history."  (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.)  That is to say, "'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.'"  (*People v. Gonzalez* (2024) 98 Cal.App.5th 1300, 1306, quoting *People v. Snook* (1997) 16 Cal.4th 1210, 1215.)

c.  *The Plain Language of Section 1172.6 Applies to Any Defendant Convicted of Murder, Attempted Murder, or Manslaughter, Under the Felony Murder or Natural and Probable Consequences Doctrine*

Section 1172.6, subdivision (a), provides in relevant part:  "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner *to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts* when all of the following conditions apply:  [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine.  [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or

20

attempted murder. [¶] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (Italics added.)

The plain language of subdivision (a) of section 1172.6 does not exclude persons based on the nature of the sentence imposed. Instead, it refers only to challenges to convictions incurred under a now-invalid theory of murder, attempted murder, and manslaughter, rather than a collateral challenges to a death sentence raised in a petition for writ of habeas corpus. It does not directly affect or address collateral challenges to death sentences, except insofar as resentencing may be required following a successful petition challenging the underlying murder conviction. At oral argument, the People agreed that capital defendants are entitled to have the validity of their convictions re-examined in light of the amendments to sections 188 and 189; it is simply the vehicle for raising the claim that is contested. We therefore must determine if a capital defendant may seek vacatur of his murder conviction and resentencing by way of a petition for writ of habeas corpus.

The Supreme Court, in dicta, appears to have tacitly approved this approach in *People v. Wilson* (2024) 16 Cal.5th 874 (*Wilson*), where it acknowledged the applicability of a claim under the California Racial Justice Act of 2020 (RJA) (§ 745, subd. (b)) to capital defendants. (*Wilson*, *supra*, at pp. 950-951.) There, the court acknowledged that the RJA authorizes capital defendants to raise RJA claims through the same mechanism contained in section 1509 (that is, a petition for writ of habeas corpus), by clarifying that "there is no legal obstacle preventing Wilson and other defendants in his position from

21

simultaneously pursuing relief through a direct appeal and relief in the superior court through a petition for writ of habeas corpus," drawing "on settled principles in the habeas context to afford defendants whose RJA claims are independent of the claims on appeal a timely opportunity to raise extrarecord RJA claims without regard to the status of proceedings on appeal." (*Wilson*, at pp. 955, 958.)

This strongly suggests that capital defendants whose murder convictions predated *Banks* and *Clark,* as well as the criminal justice reforms of Senate Bill No. 1437, and whose appeal and original habeas petition predated the reforms of Senate Bill No. 1437, may file a successive petition for writ of habeas corpus, pursuant to section 1509, seeking relief in accordance with section 1172.6.

For this reason, we conclude that a defendant convicted of murder under a theory of felony murder, who asserts he was not the actual killer but instead was convicted as an aider or abettor of the underlying felony, and lacked an intent to kill, is not precluded from seeking relief pursuant to the procedures implemented by enactment of Senate Bill No. 1437 on the ground he was sentenced to death. Thus, under the plain language of section 1172.6, there is no carve-out for persons who are sentenced to death who meet the other criterial of the statute. There are, however, other sound policy reasons for authorizing the remedial provisions established by Senate Bill No. 1437 as well as considerations relating to how the procedures outlined in section 1172.6 will apply to a capital defendant.

Following oral argument, defendant sent a letter regarding the recent passage of Assembly Bill No. 2483 (Stats. 2024, ch. 964, § 1, p. 93, eff. Jan. 1, 2025) which

amended section 1213 and added section 1171, in which he urged us to find that a capital defendant is entitled to seek resentencing relief under section 1172.6 without the need for complying with section 1509. We vacated submission of the case and invited a response by the People.

After reviewing the letter briefs and the text of Assembly Bill No. 2483, we note that the purpose of the Bill was to provide specific guidance for how to put the new ameliorative laws into practice, reduce the wide variation and inefficiency across the state, and to create uniform resentencing procedures would help resolve cases efficiently and consistently across the state while reducing costly litigation. (Assem. Bill No. 2483 (2023-2024 Reg. Sess.) (Stats. 2024, ch. 964, §1, p. 93).)

Specifically, "[t]his bill would require the presiding judge of each county superior court to, on or before March 1, 2025, convene a meeting to develop a plan for fair and efficient handling of postconviction proceedings, as specified. The bill would require the presiding judge to invite to the meeting, among others, a representative from the district attorney, the public defender, and other entities that the presiding judge deems necessary in order to ensure timely and efficient postconviction proceedings." (Legis. Counsel's Dig., Assem. Bill No. 2483 (2023-2024 Reg. Sess.) p. 93.)

Further, the Legislative Counsel's Digest explains the bill "would require, upon request from the defendant, the district attorney of the county in which the defendant was sentenced, or the Attorney General if the Department of Justice originally prosecuted the case, the Department of Corrections and Rehabilitation to provide to the requesting party

23

specified records, including disciplinary records, as specified." (Legis. Counsel's Dig., Assem. Bill No. 2483 (2023-2024 Reg. Sess.) p. 93.)

Among the provisions of the newly enacted section 1171, which will go into effect on January 1, 2025, is the last subsection, stating, "This section shall not be interpreted to authorize anything prohibited by an initiative statute." (§ 1171, subd. (h), added by Stats. 2024, ch. 964, § 2, p. 93.)  Section 1509 is an initiative statute which prohibits a capital defendant from bringing postconviction collateral challenges by a procedural vehicle other than a petition for writ of habeas corpus under section 1509, as required by Proposition 66.  As we have held, however, this does not mean the defendant is deprived of the right to have his conviction and sentence reviewed in light of the statutory changes affecting sections 188 and 189.

d. *Policy Reasons for Authorizing Relief Pursuant to Senate Bill No. 1437 for Capital*
   *Defendants*

In addition to the plain language of the statute which contains no express exceptions for capital defendants, there are other sound policy reasons for authorizing capital defendants to section 1172.6 procedural relief by way of a habeas corpus petition, where to deny relief would result in potential violations of equal protection and would frustrate the intent of the Legislature.

(i) *Equal Protection Issues*

One sound reason is that denial of access to relief to persons sentenced to death, the most serious consequence of a murder conviction would raise serious equal protection questions as to whether the challenged difference in treatment is justified.  (See *People v.*

24

*Hardin* (2024) 15 Cal.5th 834, 847-851 [addressing statutory difference in treatment between youthful offenders sentenced to life without parole and holding that it is unnecessary for a court to determine if the two groups are similarly situated where there is a rational basis].)  In *Hardin*, the court reasoned that there could be "'a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose.'"  (*Ibid*., citing *People v. Chatman* (2018) 4 Cal.5th 277, 288–289.)

Senate Bill No. 1437 and the procedural provisions of section 1172.6, exclude offenders who have been convicted of murder who were the actual killer, or who were direct aiders and abettors who acted with intent to kill, were major participants and acted with reckless indifference to human life.  (§ 189, subd. (e).)  It does not limit its remedial provisions to persons based on the nature of the sentence imposed.

Logically, and following the plain language of the statutes, the statutory remedy applies to persons convicted of first degree as well as second degree murder, with or without special circumstances allegations, where the other criteria for a successful petition are alleged.  The disparate treatment of one category of persons convicted of murder with special circumstances, where the statute does not establish any rational relationship between the disparity in treatment and some legitimate government purpose, would violate equal protection because there is no rational basis for limiting relief to persons convicted of felony murder, who were not the actual killer, did not have an intent to kill or act as a major participant with reckless indifference to human life, simply because they received the death penalty.

In addition, the purpose of section 1509, which was to streamline the habeas corpus process in capital cases (see *In re Friend* (2021) 11 Cal.5th 720, 725 [discussing Proposition 66's statutory reforms intended to make the system of capital punishment more efficient, less expensive, and more responsive to the rights of victims, including various changes to the procedures for handling and resolving habeas corpus petitions in capital cases]), does not appear to support an interpretation that a capital defendant is precluded from challenging the validity of his conviction in light of changes to sections 188 and 189, from which the capital sentence flows. Indeed, to this point, cases in which capital defendants have appealed after seeking relief under Senate Bill No. 1437, have not been denied on the basis of section 1509.

There is no rational basis to preclude a capital defendant from seeking relief under the provisions of Senate Bill No. 1437, where the defendant claims he or she was not the actual killer or that the conviction for murder is potentially invalid under the felony murder doctrine or the natural and probable consequences theory, especially where the conviction predates the amendments to sections 188 and 189. In other words, the state has no legitimate purpose in executing persons who were convicted under a now invalid theory of murder, irrespective of the procedural vehicle used to seek review.

Allowing relief to persons convicted of murder with special circumstances who are sentenced to life without possibility of parole whose convictions predate the amendments to sections 188 and 189, while denying it to those who are sentenced to death based on convictions for murder with special circumstances also prior to those amendments, would be arbitrary, unless the person sentenced to death was the actual

26

killer, or, if not the actual killer, a direct aider and abettor who was a major participant in the crime and acted with reckless indifference to human life. A murder conviction based on the felony murder doctrine, resulting in a sentence of death to a person who alleges he was not the actual killer, is no less subject to question.

(ii) *Other Policy Considerations Requiring Reconciliation of Procedural*

*Differences*

The Supreme Court has not yet addressed whether and how a capital defendant like Thompson, whose appeal was final, and his original section 1509 petition had been decided by the superior court but stayed (indefinitely) on appeal prior to the enactment of Senate Bill No. 1437, should present claims that his murder conviction is invalid under current law, in light of amendments to sections 188 and 189. Although we must agree the defendant is required to raise the issues in a petition for writ of habeas corpus under section 1509, we note some differences in the manner in which habeas petitions are evaluated that may impair a capital defendant's ability to seek full and proper review of the current validity of his murder conviction. We turn now to that question.

(a) *Distinctions Between the Procedures Applicable to Section 1172.6 Petitions*

*and Those Applicable to Section 1509 Habeas Petitions*

The People agree that resentencing claims may be raised in a section 1509 petition but do not address some distinct differences in the procedures related to section 1509 and those written into section 1172.6. We discuss these to guide the superior court on remand.

27

(i) *Adequacy of the Petition It's part of (e)*

First, section 1172.6, subdivision (a), requires that the petition allege (1) the accusatory pleading allows the "prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine" (*Id.*, subd. (a)(1)); (2) the "petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder" (*Id.*, subd. (a)(2); and (3) the "petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019" (*Id.*, subd. (a)(3)).

In reviewing the adequacy of the petition, a court ""takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause.'"" (*Lewis*, *supra*, 11 Cal.5th at p. 971, quoting *People v. Drayton* (2020) 47 Cal.App.5th 965, 978 (*Drayton*).)

(ii) *Appointment of Counsel*

Of great concern to us is the issue of appointment of counsel to pursue the habeas proceedings, given the delays inherent in the process under section 1509. This conundrum has led to indefinite delays in the appellate review of lower court orders granting or denying petitions for writ of habeas corpus pursued under section 1509. In

*Wilson*, the Supreme Court acknowledged this issue respecting the defendant's attempt to pursue an RJA claim, and concluded that "[a] petition addressed specifically to RJA claims, with counsel appointed pursuant to the procedures specified in the RJA, is not inconsistent with Proposition 66's overarching aim of promoting the efficient resolution of challenges to capital sentences. [Citation.] In other words, a defendant need not necessarily await the appointment of counsel available to assist with a full capital habeas petition; the defendant may file a postjudgment RJA petition with the assistance of counsel appointed pursuant to section 1473[, subdivision] (e) for that specific, limited purpose." (*Wilson*, *supra*, 16 Cal.5th at p. 958.)

Similarly, a petition addressed specifically to Senate Bill No. 1437 claims with counsel appointed pursuant to the procedures specified in section 1172.6, is not inconsistent with Proposition 66's aim of promoting efficient resolution of challenges to capital sentences. Therefore, if the pleading requirements of section 1172.6, subdivision (a), are met, a capital defendant is entitled to appointment of counsel pursuant to section 1172.6, subdivision (b)(3). (*Lewis*, *supra*, 11 Cal.5th at p. 963 [petitioners requesting counsel are to receive counsel upon the filing of a compliant petition].)

For similar reasons, we conclude that if a capital defendant raising a section 1172.6 claim for resentencing in a section 1509, seeks appointment of counsel, he or she is entitled to counsel as provided in section 1172.6, rather than section 1509, to avoid the lengthy delay.

(iii) *Response by the People*

Another difference between the procedures applicable to sections 1172.6 and 1509, is the requirement of section 1172.6, subdivision (c), that the People *shall* file a response within 60 days of the filing of a compliant petition under section 1172.6. (§ 1172.6, subd. (c).)  In habeas proceedings, the petition for writ of habeas corpus has only a "limited function."  (*In re Lawler* (1979) 23 Cal.3d 190, 194.)  For this reason, in habeas corpus proceedings, a response by the People is not automatically required. Instead, "'[t]o assist the court in determining the petition's sufficiency, the court *may* request an informal response from the petitioner's custodian or the real party in interest.'" (*Maas v. Superior Court* (2016) 1 Cal.5th 962, 974, italics added.)

Therefore, upon the filing of a successive habeas corpus petition seeking resentencing under the provisions of section 1172.6, a response by the People shall be required.

(iv) *Requirement of a Hearing to Determine Whether a Prima Facie Showing Has Been Made*

Finally, under section 1172.6, subdivision (c), "[a]fter the parties have had an opportunity to submit briefings, the court *shall* hold a hearing to determine whether the petitioner has made a prima facie case for relief.  If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause.  If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."  (Italics added.)

A petitioner for writ of habeas corpus is not automatically entitled to a hearing until a court determines whether the petitioner has made "a prima facie showing that they are entitled to relief." (§ 1473, subd. (b)(D)(vi).) If the habeas petition fails to make a prima facie showing of entitlement to relief, it may be summarily denied, without appointing counsel or conducting a hearing. (*People v. Duvall* (1995) 9 Cal.4th 464, 475.)

To give a capital defendant the benefit of section 1172.6, a hearing must be held after the People have filed their response and the defendant has filed a reply, if any, to determine if defendant has established a prima facie showing. We conclude that decisions interpreting section 1172.6 and the manner in which a trial court determines if a defendant has made a prima facie showing should apply in cases where a capital defendant is required to seek resentencing by way of a petition for writ of habeas corpus pursuant to section 1509. Additionally, if the trial court denies a habeas petition raising section 1172.6 claims, it must give a statement of reasons as required by section 1172.6.

Additional provisions governing the manner by which the trial court determines if a defendant has made a prima facie showing should also apply to capital defendants. "Senate Bill [No.] 1437 also created a procedure for defendants already convicted of murder under the former law to obtain retroactive resentencing in the trial court. That procedure permits these defendants to petition for resentencing if they could not currently be convicted under the newly amended sections 188 and 189. It calls for a series of adjudication steps, starting with a determination of prima facie sufficiency under section 1172.6, subdivision (c); followed, where necessary, by an evidentiary hearing under

31

section 1172.6 subdivision (d); and finally, where the petitioner prevails at the evidentiary hearing, by redesignation of the conviction at issue under section 1172.6, subdivision (e). (Stats. 2018, ch. 1015, § 4.)" (*People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1236.)

"[A]t the prima facie stage of a resentencing petition the trial court should not decide unresolved factual issues that involve credibility determinations or weighing of evidence. Rather, it should decide such issues only after issuing an order to show cause and holding an evidentiary hearing. (*People v. Duchine* (2021) 60 Cal.App.5th 798, 811, fn. omitted, citing *Drayton*, *supra*, 47 Cal.App.5th at pp. 980-982.)

Additionally, the fact a jury has found true a felony-murder special circumstance (§ 190.2, subd. (a)(17)) does not necessarily preclude a defendant from establishing a prima facie basis for relief. "Neither the jury's pre-*Banks* and *Clark* findings nor a court's later sufficiency of the evidence review amounts to the determination section 1172.6 requires, and neither set of findings supplies a basis to reject an otherwise adequate prima facie showing and deny issuance of an order to show cause." (*People v. Strong* (2022) 13 Cal.5th 698, 710-719.)

We are mindful that an argument can be made that a trial court's erroneous conclusion is harmless in light of the decision in *People v. Curiel* (2023) 15 Cal.5th 433 (*Curiel*), due to the possible preclusive effect of the special circumstances findings of

intent to kill.[5]   However, Thompson's conviction and findings have not been evaluated under the factors outlined by the holdings of *Banks* and *Clark*.  Because the trial court categorically ruled Thompson failed to establish a prima facie basis for relief solely because of the special circumstance finding, we are not free to extrapolate that Thompson's involvement in the underlying murder conviction demonstrates he had the intent to kill, or was a major participant acting with reckless indifference to human life where his conviction predated the decisions in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522.

In briefing, Thompson sought a reversal of the summary denial of his petition based on the holding of *Strong*, *supra*, 13 Cal.5th 698.  The People agreed that remand is appropriate in light of the trial court's ruling.  However, the People also assert the issue should have been raised in accordance with Proposition 66 by way of a habeas petition pursuant to section 1509.

---

[5]     Respecting the felony-murder special circumstance, the jury was instructed "If you find that the defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true unless you're satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested or assisted any actor in the commission of the murder of the first degree, or with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the crime of robbery which resulted in the death of a human being, namely, Ronald Gitmed."  However, no similar instructions were given regarding Thompson's underlying murder conviction, or the prior murder special circumstance.

2. *Additional Guidance for Remand*

A petitioner who alleges that he or she could not currently be convicted of a homicide offense "'because of changes to Section 188 or 189 made effective January 1, 2019' [citation] puts at issue all elements of the offense under a valid theory." (*Curiel*, *supra*, 15 Cal.5th at p. 462.) Here, Thompson was charged with murder under theories of deliberate and premeditated murder as well as felony murder. The information further alleged two special circumstances: that Thompson was previously convicted of first or second degree murder (§ 190.2, subd. (a)(2)), and that the murder was committed while Thompson was engaged in, or was an accomplice in, the commission of, attempted commission of, among other felonies, robbery. (§ 190.2, subd. (a)(17)(i) [subsequently renumbered as § 190.2, subd. (a)(17)(A)].)

"Senate Bill [No.] 1437 relief is unavailable if the defendant was either the actual killer, acted with the intent to kill, or 'was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2.'" (*Strong*, *supra*, 13 Cal.5th at p. 710.)

Thompson maintained that because the jury found the gun use allegation not true, it necessarily found that he was not the actual killer, although this assertion was rejected in his direct appeal where the Supreme Court stated, "we reject [Thompson's] contention that the split verdict means the jury convicted him on an aider and abettor theory. But even assuming the jury found the special circumstance allegation true on that theory, we conclude there was substantial evidence to support the conclusion that [Thompson] was an aider and abettor who, at the least, was a major participant who acted with reckless

34

indifference to human life. As discussed, the evidence supports the conclusion that, after [Thompson] brought Gitmed to the compound, [Thompson] and Mercurio jointly maneuvered to bring him to an isolated spot at Canyon Lake where both participated in the robbery and murder." (*Thompson I.*, *supra*, 49 Cal.4th at p. 126.)

However, the opinion in Thompson's direct appeal preceded the Supreme Court's later decisions in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522, so defendant should be permitted to have the validity of his conviction and special circumstances findings evaluated in light of recent legal developments.

The Supreme Court's evaluation of the sufficiency of the evidence to prove the special circumstances allegations in Thompson's direct appeal does not answer the primary inquiry of whether Thompson's conviction for murder under the felony-murder doctrine passes muster in light of the amendments to sections 188 and 189. Findings made after *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522 ordinarily establish a defendant's ineligibility for resentencing under Senate Bill No. 1437 and thus preclude Thompson from making a prima facie case for relief. (*Strong*, *supra*, 13 Cal.5th at p. 710.) However, findings made prior to *Banks* and *Clark* do not categorically preclude a defendant from establishing a prima facie case. (*Strong*, at pp. 719-721.)

As one reviewing court framed it, "The key question in determining whether the trial court properly denied [defendant's] petition is whether it was *possible* for a juror to have (1) found h[im] guilty of felony murder, and (2) found to be true the robbery/burglary special circumstances allegations, . . . without also finding [he] personally killed the victim?" (*People v. Harden* (2022) 81 Cal.App.5th 45, 54.)

35

Because this analysis necessarily involves a factual determination, we are not free to engage in the analysis in this appeal. (*Lewis*, *supra*, 11 Cal.5th at p. 972.) Nor can we reverse the trial court's judgment and direct that an order to show cause be issued, in light of Proposition 66's mandate.

The People concede that the case must be remanded to allow the trial court to review the record of conviction and make a determination of whether Thompson's murder conviction, as a direct aider or abettor, establishes he had intent to kill, or was a major participant who acted with reckless indifference to human life. However, the merits of defendant's petition must be raised in a petition for writ of habeas corpus under section 1509, as mandated by Proposition 66, while affording the defendant application of the salient provisions of section 1172.6.

We therefore remand the case to the superior court with directions to vacate the trial court's ruling on defendant's section 1172.6 petition, without prejudice to defendant to file a petition for writ of habeas corpus per section 1509, seeking resentencing as provided in section 1172.6.

## DISPOSITION

The trial court's order denying Thompson's petition for resentencing as a matter of law is vacated and the matter is remanded to the trial court with directions to grant defendant leave to file a petition for writ of habeas corpus pursuant to section 1509, within 60 days of the issuance of the remittitur. The petition shall be limited to seeking resentencing relief as provided by section 1172.6 and the court shall appoint counsel as

provided by section 1172.6, if defendant so requests.  The matter shall proceed as outlined in this opinion, following the procedures described in section 1172.6.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.

We concur:

MILLER
J.
FIELDS
J.

37